UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

LEGG MASON REAL ESTATE CDO I, LTD.                                    PLAINTIFF

v.                                                      CIVIL ACTION NO. 3:09-CV-625

JOAN M. CARLSON, et al.                                                DEFENDANTS

## MEMORANDUM OPINION

This matter is before the court on the motion of plaintiff Legg Mason Real Estate CDO I, Ltd. ("Legg Mason") for summary judgment against defendant Joan Carlson ("Carlson") (DN 42). For the reasons set forth herein, plaintiff's motion will be **DENIED**.

## BACKGROUND

In July 2006, Legg Mason loaned an entity known as Louisville Portfolio, LLC $15.2 million to purchase and renovate an apartment complex in Louisville, Kentucky. As part of the loan process, defendant Carlson and several others signed personal Indemnity and Guaranty Agreements, which provided in relevant part:

> Indemnitors hereby assume liability for, hereby guarantee payment to Lender of, hereby agree to pay, protect, defend and save Lender from and against any and all liabilities, obligations, losses, damages, costs and expenses, . . . causes of action, suits, claims, demands and judgments of any nature or description whatsoever (collectively, "Costs") which may at any time be imposed upon, incurred by or awarded against Lender as a result of any of the following:
>
> (a) All of the following obligations and amounts (regardless of whether Borrower is liable therefor pursuant to the terms of the Note):
>
> . . . .

(7) to the full extent of the losses or damages incurred by Lender on account of waste committed on the Property by, or damage to the Property as a result of the intentional misconduct or gross negligence of Borrower or any of its principals, officers, partners, managing members or managers, any guarantor, any indemnitor or any agent or employee of any such persons, or any removal of the Property in violation of the terms of the Loan Documents.

Pl.'s Compl. Ex. 3 at 3 (hereinafter "Guaranty Agreement").

Both Legg Mason and the defendants entered into the transaction aware that the property, which had been built in the early 1970s, had a number of problems. A pre-loan inspection ordered by Legg Mason in early 2006 revealed, *inter alia*, worn and aging shingles on the roof, rotting exterior soffits, and mold growth as the result of poor flashing over exterior doors. *See* Resp. to Pl.'s Mot. for Summ. J., Ex. A (hereinafter "ECS Report"). The ECS Report recommended replacing the shingles on the roof and conducting semi-annual roof inspections thereafter, but did not recommend any other action be taken or find any structural problems with the roof. ECS Report at 9. The Report also concluded that the plumbing appeared to be in good condition and was functioning adequately for demand. ECS Report at 12. To fund the necessary repairs and renovations on the property, Legg Mason established a Renovation Reserve Fund, from which it disbursed more than $2 million. Louisville Portfolio used these funds to, among other things, replace the shingles on the roofs throughout the property; however, it did not conduct any structural repairs.

In July 2007, Louisville Portfolio defaulted on the loan. The parties reached an agreement to avoid foreclosure, which included amending the Guaranty Agreement to limit the defendants' liability to $45 million; however, this did not affect their obligations with respect to waste. In 2008, the Louisville Portfolio found itself in default again, and in early 2009,

Louisville Portfolio deeded the property to Legg Mason in lieu of foreclosure. As part of the transaction, Legg Mason promised not to sue Louisville Portfolio.

Prior to this transfer, Legg Mason ordered two additional inspections of the property. Both revealed serious problems with the roof and plumbing. An inspection conducted by Environ Corporation in mid-2008 found that apartments and hallways throughout the complex had been flooded with raw sewage on numerous occasions and that a number of sewage or water leaks had appeared on interior walls. Pl.'s Compl. Ex. 9 (hereinafter "Environ Report") at 2. Environ's investigation of the complex's internal plumbing structure revealed, among other things, degraded cast iron piping and improper installation of a number of plumbing components. Environ Report at 2.

An inspection of the roof conducted by Ray Engineering in November 2008 showed that the roofs on the property had originally been constructed without truss braces or sheathing clips. As a result, the roof had settled significantly, leading to leaks in the upper apartment units and on exterior walls. Pl.'s Compl. Ex. 10 (hereinafter "Ray Report") at 3–4. The Ray Report estimated that it would cost approximately $700,000 to repair the roof and at least $190,000 to repair the plumbing. *Id.*

In August 2009, Legg Mason brought this action against the individuals who had signed the Guaranty Agreement, alleging that their failure to address the roof and plumbing issues constituted waste under the terms of the Agreement.[1] Legg Mason seeks to recover the money it disbursed to renovate the property and a judgment in the amount required to "correct the

---

[1]Three of the four original defendants failed to respond to Legg Mason's complaint. *See* DN 33 (entry of default for Herbert H. Kollinger, Edwin P. Kollinger, and Erich F. Kollinger). Only Joan Carlson is currently defending this action.

deficient and wasteful construction and management activities of the Defendants, or their agents." Pl.'s Compl. at 14. Legg Mason now moves for summary judgment on its waste claim.

**ANALYSIS**

Under Federal Rule of Civil Procedure 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of indicating the portions of the record that support its motion and show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact arises when there is "sufficient evidence on which the jury could reasonably find for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1985). When deciding a summary judgment motion, the court must construe all evidence and inferences drawn from it in favor of the nonmoving party. *Blakeman v. Mead Containers*, 779 F.2d 1146, 1150 (6th Cir. 1985).

**1. Legal Standard**

As a threshold matter, we must address the proper legal standard by which Carlson's conduct should be judged. Carlson claims that under the language of the Guaranty Agreement, she is liable only for damage that results from "intentional misconduct or gross negligence." This argument is without merit. The relevant part of the Guaranty Agreement states that a given guarantor is liable for "waste committed on the Property by, *or* damage to the property as a result of the intentional misconduct or gross negligence of Borrower or any of its principals. . . ." Guaranty Agreement at 3 (emphasis added). A court will not read an ambiguity into a contract where one does not exist, *see, e.g.*, *First Commonwealth Bank of Prestonsburg v. West*, 55

S.W.3d 829, 936 (Ky. App. 2000), and the language in the Agreement at issue here is quite clear: Carlson may be held liable for damage resulting from waste, intentional misconduct, *or* gross negligence – not just the latter two.

**2. Legg Mason's Waste Claim**

The question of whether Carlson is liable under the Guaranty Agreement is a question of contractual interpretation. Absent an ambiguity, a court will enforce a written instrument strictly according to its terms. *Island Creek Coal Co. v. Wells*, 113 S.W.3d 100, 104 (Ky. 2003) (quoting *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 105–06 (Ky. 2003)). A contract's terms will be interpreted "by assigning language its ordinary meaning and without resort to extrinsic evidence." *Id.* "Waste" is not defined in the Agreement; therefore we will look to the term's ordinary meaning to determine whether Carlson is liable for it.

Under Kentucky law, the holder of a possessory estate commits waste when he or she fails to take reasonable care of the premises. *Fisher's Ex'r v. Haney*, 202 S.W. 495, 496 (Ky. App. 1918). Such waste may include neglecting to keep buildings in "such a state of repair as would be considered reasonably sufficient under the circumstances." *Id.* (citing *Smith v. Mattingly*, 28 S.W. 503 (Ky. App. 1894)). *See also Prescott v. Grimes*, 136 S.W. 206, 208 (Ky. App. 1911) ("[a]s a general rule a tenant for life must make all ordinary, reasonable, and necessary repairs required to preserve the property and prevent its going to decay or waste.")

More recent cases from other jurisdictions affirm that a non-owner's unreasonable failure to take care of the property remains the standard for a claim of waste. *See, e.g.*, *Manor Enters. v. Vivid, Inc.*, 596 N.W.2d 828, 837 (Wis. App. 1999) (defining waste as "(1) unreasonable conduct by the owner of a possessory estate, (2) resulting in physical damage to the real estate, and (3) a

substantial diminution in the value of the estate in which others have an interest."); *Kimbrough v. Reed*, 943 P.2d 1232, 1234 (Id. 1997) (defining waste as "[a]ction or inaction by a possessor of land causing unreasonable injury to the holders of other estates in the same land.").

Legg Mason claims that Carlson should be liable for waste because "[t]he evidence shows Louisville Portfolio's failure to maintain the roof and plumbing, and Legg Mason's subsequent expenditure of over $2 million to repair the roof and plumbing, was waste."[2] Pl.'s Mot. for Summ. J. at 4. Legg Mason's waste claim rests primarily the fact that the pre-loan inspection did not reveal problems with the roof or plumbing – but inspections two years later did. According to Legg Mason, this demonstrates that Louisville Portfolio improvidently expended the renovation funds and failed to keep the property in a reasonable state of repair.

Summary judgment is inappropriate in this case because there exist genuine issues of material fact with respect to several issues. First, the record contains little that would allow us to assess whether Louisville Portfolio acted reasonably with respect to the property under the circumstances. Although both the Ray and Environ Reports say a great deal about the condition of the property in late 2008, they provide few details about how Louisville Portfolio's conduct caused or contributed to it. The Environ Report does note that the response to sewage flooding apparently was limited to cleaning up waste with wet-dry vacuums and "rodding out" sewers, Environ Report at 2, while the Ray Report notes that "the roof shingles were replaced on the buildings several years ago; however, the problems with the roof trusses and sheathing were

---

[2]Legg Mason's assertion that it spent more than $2 million to repair the plumbing and roof is unsupported by the record. The record shows that Legg Mason did disburse more than $2 million from the renovation reserve fund to pay for various repairs and improvements on the property, but these disbursements covered many repairs beyond those on the plumbing and roof. *See* Pl.'s Compl. Ex. 8 at 7 (spreadsheet identifying disbursements from reserve fund for items including "landscaping," "clubhouse," and "unit interiors.").

never fixed." Ray Report at 3. Neither of these statements, however, supports the unequivocal conclusion that these actions were unreasonable or that the problems with the property were the result of Louisville Portfolio's action or neglect.

Second, there is a question of fact as to whether it would have been reasonable to expect Louisville Portfolio to repair the inherent defects in the property. Both the Environ and Ray Reports indicate that at least some of the property damage resulted from problems with the original construction of the complex. *See* Ray Report at 3 (identifying the improper installation of roof trusses as the cause of leaks in the walls and roofs); Environ Report at 2 (tracing some plumbing problems to improperly installed cast-iron piping components). Legg Mason argues that Louisville Portfolio's failure to remedy these inherent problems was waste; however, we are not convinced that such a failure was *per se* unreasonable.

According to the Restatement (Third) of Property, mortgagors are not obligated to repair defects in the property that existed at the time the mortgage was given, and failure to do so is not waste. RESTATEMENT (THIRD) OF PROPERTY: MORTGAGES § 4.6 cmt. b (1997). The logic behind this rule is that "[i]n most cases such defects could have been discovered by the mortgagee, and must be considered to have been taken into account by the mortgagee in appraising the security." *Id.* Although this rule is not binding authority in Kentucky, we find its reasoning relevant here. Legg Mason could have discovered before the mortgage was granted that the roofs were improperly constructed or that the property's plumbing was improperly installed and adjusted its assessment of the property accordingly at that time. A jury could therefore conclude that it would have been outside the scope of Louisville Portfolio's duty to maintain the property in a reasonable condition to repair pre-existing defects in the complex.

Finally, there is a question of fact as to whether Legg Mason can show that it suffered any loss as a result of Louisville Portfolio's allegedly wasteful conduct. In Kentucky, a mortgagee's interest in the property is that of a lienholder; title to the property rests with the mortgagor. *See Watt's Adm'r v. Smith,* 63 S.W.2d 796, 799–800 (Ky. App. 1933). As a general rule, "lien theory" states like Kentucky do not allow a mortgagee to recover for waste unless the mortgagor's wasteful conduct has impaired the mortgagee's security. *See Jaffe-Spindler Co. v. Genesco, Inc.*, 747 F.2d 253, 247 (4th Cir. 1984).

Legg Mason argues that this rule does not apply to this case because its recovery is premised on the Guaranty Agreement, which does not condition liability on the impairment of Legg Mason's security. Nonetheless, the Agreement does require that Legg Mason suffer "losses or damages . . . on account of waste" in order for liability to attach to the guarantors. Legg Mason appears to argue that its loss is evinced by the fact that it received from Louisville Portfolio a piece of property that required substantial repairs, even though Legg Mason had disbursed more than $2 million to renovate the property. However, the fact that the property needed significant repairs or that Legg Mason disbursed funds for renovation is not *per se* evidence that Legg Mason suffered any loss. It is possible that, after acquiring the property in lieu of foreclosure, the value of the property was such that Legg Mason could have made the necessary repairs and sold the complex at a price that would have allowed it to recover the amount spent on the repairs and any amount still owing on the mortgage. It is, of course, also possible that Legg Mason would not have been able to do so, and would therefore have suffered a loss. The record is devoid of information that would allow us to draw either conclusion.

Therefore, Legg Mason is not entitled to judgment as a matter of law, and its motion for summary judgment will be denied.[3]

        A separate order will issue in accordance with this opinion.

---

[3] We also note that even if Legg Mason does show that it suffered a loss as a result of taking the property in lieu of foreclosure, it would need to show that such loss came "on account of waste" – and not, for instance, on account of a shift in the value of the property due to market conditions.